UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10017-RWZ

UNITED STATES OF AMERICA

v.

MOISES FIGUEROA

MEMORANDUM OF DECISION

May 22, 2015

ZOBEL, D.J.

Defendant Moises Figueroa ("Figueroa") is one of 30 defendants charged variously with drug offenses and related crimes. He was accused only in Count 1, conspiracy to distribute cocaine base, cocaine, oxycodone, and marijuana in violation of 21 U.S.C. § 846, and Count 6, distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1). On January 20, 2015, he pleaded guilty to Count 1 but only as to cocaine, cocaine base, and marijuana, and to Count 6, which pertains only to cocaine base. Although defendant admitted participation in the conspiracy and distribution, he vigorously contests the government's calculation of the amount of drugs attributable to him. The government asserts that is he responsible for more than 280 grams of cocaine base, which would subject him to a ten-year mandatory minimum sentence. Defendant admits to only 134.2 grams of cocaine base and 998 grams of cocaine powder.

Figueroa waived his right to a jury on the drug quantity determination, see Docket # 1550 at 6:13-7:25, and the court held an evidentiary hearing on the issue. Detective Martin O'Malley of the Boston Police Department, who was the co-case agent working on the joint state and federal investigation that led to the indictment, was the only witness at the hearing. The parties were then invited to submit post-hearing memoranda.[1]

**I.      Legal Standard**

In a drug conspiracy case, "the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, [each] defendant." United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004). This does not mean, however, that a drug conspiracy defendant may only be sentenced based on drugs that he personally sold. "[E]ach co-conspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." United States v. Gonzalez-Velez, 587 F.3d 494, 502-03 (1st Cir. 2009) (internal quotation marks omitted). "In sentencing a defendant convicted of participation in a poly-drug conspiracy," like the one here, "care must be taken to ensure that particularized drug-type quantity findings are predicated on reliable information and, where significant uncertainty exists, that those findings err on the side of caution." United States v. Candelaria-Silva, 714 F.3d 651, 657 (1st Cir. 2013) (internal quotation marks omitted).

---

[1] Figueroa did submit a post-hearing memorandum, Docket # 1564, but the government did not.

2

The parties agree that the government has the burden of proof. Facts affecting sentencing, like drug weight, typically need to be proven by a preponderance of the evidence and may be decided by the court. See, e.g., United States v. Almeida, 748 F.3d 41, 53 (1st Cir. 2014). But, when a fact triggers a mandatory minimum sentence, "the Sixth Amendment requires [it] to be treated as an element of the crime." United States v. Morris, No. 13-1369, 2015 WL 2137656, at *2 (1st Cir. May 7, 2015). The government therefore must prove such facts beyond a reasonable doubt. See United States v. Etienne, 772 F.3d 907, 921 (1st Cir. 2014); see also Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

The mandatory minimum sentence of ten years imprisonment is triggered by 280 grams of a mixture containing cocaine base.[2] 21 U.S.C. § 841(b)(1)(A)(iii). I therefore must determine whether the government has proven beyond a reasonable doubt that 280 grams of cocaine base are attributable to Figueroa. If I so find, I must evaluate the evidence of any further drug quantities under the preponderance of the evidence standard.

**II. Discussion**

The government's evidence falls into four categories. First, it offered evidence that Figueroa engaged in four controlled buys of crack cocaine between October 25, 2011, and November 25, 2011. These buys, according to the government, collectively

---

[2] There is another relevant mandatory minimum, but it is not implicated in the court's drug weight determination. Section 841(b)(i)(B)(iii) of Title 21 imposes a five-year mandatory minimum for offenses involving 28 or more grams of a mixture containing cocaine base. Figueroa does not contest the application of the lower sentence, conceding that 134.2 grams of cocaine base are attributable to him. See Def.'s Mem. of Law on the Applicable Drug Quantity, Docket # 1564, at 2.

3

involved 109.4 grams of mixtures containing cocaine base. Second, it offered wiretap evidence of a sale of 500 grams of cocaine powder. In the government's view, Figueroa knew that this cocaine would be used to make cocaine base and should therefore be counted as a sale of 500 grams of cocaine base. And, because that recorded phone call also included discussions of a prior sale of 500 grams of cocaine powder, the government attributes that additional 500 grams as cocaine base to defendant, using similar logic. Third, the government offered evidence of a January 17, 2013 search of Figueroa's residence that turned up 79.6 grams of cocaine base and 498 grams of cocaine powder. Finally, the government offered testimony that a search of Figueroa's mother's home turned up several safe deposit box keys. Two of those keys belonged to boxes at a neighborhood bank which officers found to contain $307,000. Because Figueroa is an admitted "crack dealer," the government contends that this money must have been his and come from his sales of cocaine base. Then, based on a conversion using crack's street value, this money should be counted as up to 14,000 grams of cocaine base.[3]

Defendant accepts responsibility for some of these quantities. He does not contest that the cocaine base involved in controlled buys on November 14, 2011, and November 25, 2011, totaling 54.6 grams, is properly attributable to him. He does, however, dispute the amounts from the remaining two controlled buys. Figueroa similarly accepts responsibility for the 500 grams of cocaine powder sold on September

---

[3] The government did not take a firm position on the conversion factor at the hearing, instead offering a conversion of "anywhere from seven to 14 kilograms of cocaine base." Docket # 1550 at 17:5.

4

27, 2012, but he challenges the government's attempt to count the cocaine powder as cocaine base for sentencing purposes and the government's attempt to attribute an earlier sale of 500 grams of cocaine powder to him. And although Figueroa accepts responsibility for both the cocaine powder and cocaine base seized at his home, he disputes that the $307,000 seized from his mother's safe deposit boxes is his and, even if it is, that it should be converted to some amount of crack cocaine for sentencing purposes.

The issues for the court to decide are therefore (1) are the drug quantities from the remaining two controlled buys attributable to Figueroa; (2) has the government met its burden to convert the 500 grams of cocaine powder sold on September 27, 2012, to cocaine base for sentencing purposes; (3) is the reference to a prior sale of 500 grams of cocaine powder in the September 27, 2012, phone call sufficient to attribute these drugs to Figueroa; and (4) did the $307,000 seized from the safe deposit box belong to Figueroa and, if so, should it be converted to cocaine base for sentencing purposes? As explained below, I answer only part of the first question in the affirmative.

### A. Controlled Buys

#### 1. October 25, 2011

The first controlled buy allegedly involving Figueroa was on October 25, 2011. This buy, like many others in this case, involved a cooperating witness ("CW"). According to Detective O'Malley's testimony, the cooperating witness, equipped with audio and video surveillance equipment, sought to buy an ounce of crack cocaine from co-defendant Hamilton Lopes. Lopes directed the cooperating witness to "the block,"

which is 37 Hendry Street. There, on the second floor, the cooperating witness met with co-defendants Victor Scott and John Webbe. They told the cooperating witness that they did not have an ounce of crack, so they called someone else. Detective O'Malley interpreted the recording as identifying the person as "Moe," a nickname used by Figueroa. The only evidence presented of the phone call is video and audio surveillance of Scott. Neither wiretaps nor phone records were presented.

The CW spoke with the individual alleged to be Figueroa by phone and asked for an ounce of crack. According to Detective O'Malley, Figueroa quoted a price that exceeded the funds that the CW had. The CW left, got more money from a law enforcement officer, and returned to the second floor of 37 Hendry Street. Scott again called Figueroa, but that call, like the earlier one, was only recorded on Scott's end. Scott asked the person on the phone if he could get the crack off of "D," who Detective O'Malley testified was co-defendant Carl Taylor, a downstairs neighbor. Although not clear from the surveillance evidence, the conversation suggests that Scott and the person alleged to be Figueroa discussed replacing the crack borrowed from Taylor at a later time. The CW was able to purchase an ounce of crack from Taylor, which he turned over to the investigating officers. A federal drug lab later determined that the substance the CW purchased was 25.9 grams of a mixture containing cocaine base.

The government seeks to attribute this 25.9 grams of cocaine base to Figueroa because Figueroa allegedly agreed with Scott to replace the drugs taken from Taylor at a later time, thus enabling the transaction. The evidence does not prove this theory beyond a reasonable doubt. First, I am not satisfied that the recording shows

6

Figueroa's involvement in the transaction. The recordings are one-sided, so the individual whom Scott called cannot be clearly identified. Although Detective O'Malley testified that he "believe[d]" the person on the phone to be Figueroa, he acknowledged that the recording of the person's voice was "faint." Scott does appear to identify the person on the phone as "Moe," which is a name used by Figueroa, but the muffled recording and the extensive use of slang leaves doubt even about this. At one point, even Detective O'Malley had difficulty distinguishing between "It's Moe" and "An O" in the recording. Docket # 1550 at 38:22-23. Second, even if I were to find that Figueroa was on the other end of the phone call, the one-sided recording is insufficient to show that a deal was reached in which Figueroa would replace Taylor's crack. The side of the conversation that was recorded does not indicate that the other party assented to the agreement, and the government presented no evidence of subsequent activities to support the existence of such a deal.

### 2. November 1, 2011

The next controlled buy allegedly involving Figueroa occurred on November 1, 2011. The government presented a recording (two-way, this time) of a telephone call between the CW and Figueroa. The CW told Figueroa that he could not reach "P," whom Detective O'Malley identified as co-defendant Alexis Hidalgo. Figueroa told him that Hidalgo was just waking up, then asked what was going on. The CW replied that he was "just tryin' to get an onion"—another street term for an ounce of crack, per Detective O'Malley. Figueroa then offered to call "the block," make sure the drugs were there, and call the CW back "to let you know if it's a go or not." Figueroa kept his word.

7

He called the CW back and directed the CW to 37 Hendry Street. This completed Figueroa's involvement, but the CW then went to 37 Hendry Street and completed a controlled buy of a substance that he turned over to law enforcement officers. A federal drug lab later determined that the substance the CW purchased was 24.8 grams of a mixture containing cocaine base.[4]

I find that the government has proven, beyond a reasonable doubt, that this transaction is attributable to Figueroa. The phone call demonstrates that Figueroa knew the type of drug that the CW was seeking and the amount. It also shows, in combination with Detective O'Malley's testimony, that Figueroa called his co-conspirators to ensure that the drugs could be delivered to the CW. Even though the government has not shown Figueroa made the sale himself or handled either the money or the drugs, the evidence demonstrates that Figueroa could have reasonably anticipated that his co-conspirators would make the sale. That is sufficient to attribute the 24.8 grams of cocaine base to him.

### B. September 27, 2012 Sale of Cocaine Powder

Detective O'Malley next testified that, on September 27, 2012, he was monitoring a duly obtained wiretap of Alexis Hidalgo's phone. He heard Hidalgo call Figueroa. Exhibit 12, which was admitted into evidence, contains a recording of the call. Hidalgo asked whether Figueroa's "number [was] still the same thing," which

---

[4] There appears to be some confusion on the weight of the drugs seized on November 1, 2011. In its opening statement, the government recited the weight as 28.8 grams. In his post-hearing brief, Figueroa lists it as 28.9 grams. But, in his testimony, Detective O'Malley said 24.8 grams. That is corroborated by Government Exhibit 2, which is the FBI/DEA drug analysis report. I therefore proceed with 24.8 grams.

8

Detective O'Malley interpreted as asking whether Figueroa's price for drugs was the same as in a previous transaction. They discussed the price for a "half" of something that came in "white" and "beige" forms. This, according to Detective O'Malley, meant half a kilogram (i.e., 500 grams) of cocaine powder. Figueroa went on to say that he paid "23" for "white" in a previous transaction, noting that he "only made four" on it. The call ended with Figueroa telling Hidalgo that he would check with someone about Hidalgo's request for a "half" and call him back.

Figueroa called back a few minutes later, telling Hidalgo that "he [a third party from whom Figueroa would get the cocaine powder] got the beige." Hidalgo suggested he would get the money together and call Figueroa back. Two more brief calls discuss the logistics of the deal. In the first, Figueroa told Hidalgo to meet him at "the Lege," which Detective O'Malley told the court is 855 American Legion Highway in Roslindale. In the second, Hidalgo told Figueroa that he had arrived. Throughout these calls, it became apparent—according to Detective O'Malley—that Hidalgo was seeking to buy the cocaine powder on behalf of Hamza Awil, who was visiting from Maine.

On cross-examination, Detective O'Malley conceded that Hidalgo did not tell Figueroa what would happen to the cocaine powder after the buy. There was no discussion of converting the cocaine powder into cocaine base. Detective O'Malley also testified, with the aid of a surveillance report (Def. Ex. 1), that the entire transaction from Figueroa to Awil happened in short order. Figueroa passed the cocaine powder to Hidalgo's courier at 1:35 p.m.; the courier transported the drugs to another location, 225 Blue Hill Avenue, and arrived at 1:49 p.m.; and Awil left 225 Blue

9

Hill Avenue with the drugs at 2:53 p.m. Detective O'Malley also testified that, in his experience, it would take "a couple of hours" to cook half a kilogram of cocaine powder into cocaine base.

Figueroa accepts responsibility for selling half a kilogram of cocaine powder to Hidalgo, but contends that the government has not proven, beyond a reasonable doubt, that it was foreseeable that the powder would be converted to cocaine base. The court agrees. First, cocaine base was never mentioned, in any of its forms, during the recorded phone calls. Second, nothing in the record indicates that the cocaine powder Figueroa sold to Hidalgo was ever cooked into cocaine base. The timing of the transactions, an hour and eighteen minutes from the Figueroa-to-Hidalgo handoff to the time that Awil departed with the drugs, belies any inference that Hidalgo converted the powder to cocaine base. Detective O'Malley conceded that cooking this amount of cocaine base would take about two hours, and Hidalgo did not possess the drugs for that length of time. Finally, even accepting the government's position that Figueroa knew Hidalgo dealt only in cocaine base and never cocaine powder, it was not necessarily foreseeable that this particular batch of cocaine powder would be cooked into cocaine base. In the calls, Hidalgo made it clear that he was acting as a conduit for Awil. The government offered no evidence that Awil was exclusively a cocaine base dealer,[5] or, even if he was, that Hidalgo knew that. It therefore could not have been foreseeable to Figueroa that Awil would convert the cocaine powder to cocaine base.

---

[5] Notably, Defendant's Exhibit 1 indicates that Awil was stopped at 3:45 p.m. after completing the buy and eventually arrested. Nothing in the record says whether any cocaine base was seized.

Even if the court were to find that the government's evidence showed that Figueroa could have foreseen that the cocaine powder would be converted to cocaine base, its conversion methodology leaves much to be desired. The government seeks to convert cocaine powder to cocaine base using a "one-to-one ratio," Docket # 1550 at 14:4-6, but the only evidence it presented on this point is the detective's testimony that, based on his "work experiences," "cooking cocaine powder into cocaine base . . . caus[es] it to become heavier and . . . expands it." Id. at 72:8, 72:18-19. The detective, however, conceded that he had no first-hand experience with cocaine chemistry, id. at 72:11-3, and characterized his own cross-examination testimony about the cooking process as "[s]imply a guess," Docket # 1551 at 19:10. The government presented no scientific testimony on the conversion, even though its one-to-one ratio runs contrary to basic chemistry. Cocaine powder is the hydrochloride salt of cocaine base. Id. at 14:11-3; DePierre v. United States, 131 S. Ct. 2225, 2228 (2011). Converting cocaine powder to cocaine base removes the hydrogen chloride, making the molecule lighter. Assuming pure materials and a perfectly efficient conversion process—which may be an unrealistic assumption in this case, but the dearth of testimony on the conversion again leaves the court guessing—500 grams of cocaine powder converts to only 446 grams of cocaine base.[6] This difference may be small, but so are the drug quantities that trigger mandatory minimum sentences and sentencing enhancements under the

---

[6] The molecular weight of cocaine base is 303.35 grams, and the molecular weight of cocaine powder is 339.81 grams. The mass ratio of base to powder is 0.893, which gives 446 grams of cocaine base when multiplied by the 500 grams of cocaine powder that Figueroa admits was involved in the transaction.

11

guidelines.  See, e.g., U.S. Sentencing Guidelines Manual § 2D1.1(c) (2014) (increasing base offense levels for crack cocaine at 2.8, 5.6, 11.2, 16.8, 22.4, 28, 112, 196, 280, 840, 2,800, 8,400, and 25,200 grams).  To the extent the government seeks to convert quantities of one drug into another for sentencing purposes, it must offer more than "a guess" on how to do so.  See Candelaria-Silva, 714 F.3d at 657 (admonishing courts to "err on the side of caution" in drug weight calculations for poly-drug conspiracies).

As for the passing reference in the recorded call to Figueroa's prior transaction with his cocaine powder supplier, I find the evidence insufficient to support attributing additional drug quantities to him.  The government offered no further evidence about this transaction—we do not know who was involved, where the drugs were sold, or what happened to them after they were sold.  We do not even know if the deal was real or if it was conjured up to convince Hidalgo to pay a higher price.  And even if Figueroa did participate in this second buy, there is no indication that it was within the ambit of the particular conspiracy charged in this case.

### C. The Safe Deposit Box Funds

On January 17, 2013, law enforcement officers executed a search warrant upon an apartment at 855 American Legion Highway—the place where Figueroa sold the half kilogram of cocaine powder to Hidalgo, and the place where Figueroa's mother lived.  During that search, the officers discovered cocaine powder and charged another resident of the apartment, Alphonso Malarvy, with possession.  Malarvy later pleaded guilty in Suffolk Superior Court.  Also during that search, the officers discovered that

Figueroa's mother held several safe deposit boxes. They executed searches on those boxes and uncovered about $307,000 in cash. Also among the items in one of the boxes was a dirty, torn-up medical label bearing Figueroa's name,[7] along with several documents bearing the names of other individuals. The bank's records showed that the safe deposit boxes were registered to two renters: Figueroa's mother and Malarvy. There were no records of Figueroa ever accessing the boxes.

Detective O'Malley testified that, based on his experience, individuals who deal drugs do not put their own names on safe deposit boxes that hold their drug proceeds. Instead, in his view, they are likely to rent boxes in family members' names to make it harder to figure out who owns the funds. Because these boxes were rented in Figueroa's mother's name and because one of them contained an old label bearing Figueroa's name, he concluded that the $307,000 must be Figueroa's. That sum of money, according to O'Malley, likely came from the sale of seven kilograms of cocaine powder.[8]

The government has not proven that these funds are attributable to Figueroa, nor has it proven that the money came from the sale of cocaine base. First, the torn-up, dirty medical label found in one of the boxes—without more—is insufficient to link Figueroa to the funds. Although the label provides a weak connection to Figueroa, the bank's rental records and other documents in the box provide a stronger connection to

---

[7] The court infers that the label was from a healthcare provider because it included Figueroa's address, phone number, and sex, along with the common medical abbreviation "NKDA" (i.e., no known drug allergies). See Gov't Ex. 8 at 4.

[8] The government only offered testimony converting the money to a quantity of cocaine powder, but it seeks to have the money count as 7 to 14 kilograms of cocaine base. Docket # 1550 at 17.

13

his mother and Malarvy. Malarvy's intervening conviction for cocaine possession supports the reasonable inference that the funds may have been his. On its own, this is sufficient to establish reasonable doubt. Second, the government offered no testimony whatsoever linking the funds to transactions involving cocaine base. Even if the court were to assume that the funds are attributable to Figueroa and that they came from drug sales, it is equally or more likely that they came from sales of cocaine powder because cocaine powder accounts for the bulk of the drug weight attributed to Figueroa.

### III. Conclusion

Figueroa concedes that 134.2 grams of cocaine base and 998 grams of cocaine powder are attributable to him. Beyond that, the government has proven beyond a reasonable doubt that Figueroa is responsible for an additional 24.8 grams of cocaine base. Figueroa is therefore responsible for 159 grams of cocaine base and 998 grams of cocaine powder.

|  |  |
|---|---|
| May 22, 2015 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |